State *v.* Waters.

## STATE OF MAINE *versus* WATERS.

By article 1st, § 6, of the constitution of Maine, it is declared that in all criminal prosecutions, the accused shall have a right to have compulsory process for obtaining witnesses in his favor.

This provision is one of personal right recognized in the constitution of the United States, and in the organic law of most of the States, designed to guard against a particular wrong, practised under the government from which our country was severed.

But this provision does not authorize the accused in criminal prosecutions, to require of the State payment of the *fees* of the witnesses necessary in the defence; it is for the *process* only by which they may be summoned.

In § 29, c. 154, R. S., it is enacted that if any person, being armed with a dangerous weapon, shall assault another, with intent to murder, kill, maim, rob, &c., he shall be punished in the State prison, not more than twenty years.

By this provision the Legislature have recognized as distinct offences, an assault with *intent to murder*, and an assault with *intent to kill*, unknown to the common law.

An assault with *intent to murder* necessarily involves an assault with *intent to kill;* and where a party is accused of the greater, the jury are authorized to find him guilty of the lesser offence.

ON EXCEPTIONS from *Nisi Prius*, HOWARD, J., presiding.

INDICTMENT, charging defendants with an assault with a drawn sword upon one Ivory Pray, with the intent feloniously and of their malice aforethought, him the said Pray to kill and murder.

Before the trial came on, John Waters, one of the respondents, represented to the Court that a large number of witnesses were material to his defence, that he was poor and unable of his own means to procure their attendance, and moved the Court for compulsory process for obtaining such witnesses in his favor as were necessary to his proper defence and to procure their attendance at the trial.

The motion was denied, but the Court ordered that respondents have compulsory process to bring in witnesses who had been summoned and did not attend, at respondents' expense and not at the expense of the State.

The jury returned a verdict that "John Waters is guilty

State *v.* Waters.

of a felonious assault with intent to kill but not to murder Ivory Pray."

A motion in arrest of judgment was filed.

1. Because the Court denied to the defendant compulsory process for procuring the attendance of witnesses in his favor.

2. Because the jury in their verdict did not find the defendant guilty of a felonious assault with intent to kill any person.

3. Because the jury did not find defendant guilty of any offence.

4. Because defendant has not been convicted of any offence.

5. Nor of any offence charged in said indictment.

6. Because the indictment charges two distinct offences in the same count and in each count.

7. Because the verdict is not legal.

This motion was overruled, and exceptions filed.

*Wells & Bell,* with whom was *Hayes,* in support of the exceptions.

The defendant was entitled to compulsory process at the expense of the government. Const. Maine, Art. 1, § 6; R. S., c. 167, § 2; *U. S.* v. *Moore,* Wallace, 23.

2. Under this indictment the defendant cannot be convicted of an assault with intent to kill and not to murder. The cases wherein one has been convicted of manslaughter, when he was indicted for murder, do not apply.

A similar statute to R. S., c. 166, § 7, in Massachusetts, has been decided not to vary the common law, except to allow one charged with a felony to be convicted of a misdemeanor. 12 Pick. 506; 2 Met. 193. The same rule should not be applied to an indictment for assault with intent to murder, as to an indictment for murder. The intent must be proved as laid. Roscoe's Cr. Ev. 329; 2 East's P. C. 514; 3 Greenl. Ev. p. 19, § 133, n.; 24 Wend. 520.

If this verdict is sustained, it will follow, that on this in-

dictment the defendant might have been found guilty of either of five offences.

3. This verdict cannot be sustained, because there is no such offence known in the law, as an assault with intent to commit manslaughter. The statute and common law definitions of murder or manslaughter are the same. R. S., c. 154, § § 1, 5. The words "kill and murder" in § 29, c. 154, are used as synonymous. Whenever one kills a human being unlawfully and intentionally, he is guilty of murder. Where malice and deliberation is shown, no matter how instantaneous it is, the killing is murder. *Com.* v. *Dougherty*, 1 Browne, App'x, 221; Addison's R. 257; *Commonwealth* v. *Smith*, Wharton's Dig. 148; Fost. 290; 1 Hale, 455–6; 1 Rus. Cr. 520; 3 Greenl. Ev. 112; *Commonwealth* v. *York*, 9 Met. 107.

An intent to commit manslaughter must be a newly invented idea; at the common law it is a moral impossibility; it is a perversion of language, and one might as well speak of an intent to commit an accident.

*Evans, Att'y Gen., contra.*

No visionary reformer has yet gone the length of holding it to be the duty of society to furnish, at its own cost, means of defence to those charged with violating its laws. It has been thought enough, in this country, to provide that such means shall not be withheld. Arbitrary power in government has been guarded against by various constitutional provisions.

In some States, where the punishment for the offence charged is capital, witnesses on behalf of the accused are paid by the government. It is so in Maine, but here rests on usage only "*in favorem vitæ.*" There is no statute requirement of this kind.

By R. S., c. 172, § 22, in certain cases of severe punishment, compulsory process at the expense of the State may be required, to obtain witnesses in behalf of the accused, but not to pay for the witnesses; the language is plain; the clerk can only furnish the process.

State *v.* Waters.

But the defendant's counsel relies upon no statute, but upon the constitution for the right claimed.

If the Judge erred and counsel were right, it is not easy to see upon what ground the judgment can be arrested. It is not alleged that defendant was deprived of any testimony he could otherwise have obtained. He has been injured in no way than by procuring witnesses at his own cost. What has that to do with his guilt or innocence? If he has been deprived of testimony which he might have had, it might furnish ground for a *new trial,* but not for arresting the judgment.

But the Judge did not err. The constitution of U. S., and nearly all of the States, contain similar provisions to the one cited. But they do not execute themselves, nor provide the means of their execution. They all require legislation to be made available, and yet neither the Congress of the United States, nor any State, has given to this clause the interpretation contended for.

This is one of the declarations of rights, which were of great value. They grew out of oppressions and grievances actually suffered.

Formerly, by the common law of England, parties accused in capital cases, and many offences were capital, were not allowed to examine witnesses at all in their defence, and of course no process could be had for obtaining their presence. At length they were permitted to be examined, but not on oath, and therefore obtained but little credit with the jury. 1 Chitty on Crim. Law, 624.

Soon after the revolution which expelled the Stuarts, an Act was passed giving to the accused in all *cases of treason* under that Act the right to have *like process* to compel the appearance of their witnesses as was granted against them.

The statute of Maine, of 1821, is nearly a transcript of this.

A few years afterwards, 1 Ann, c. 2, it was enacted that witnesses for the prisoner on indictments for treason and felony, should be examined on oath; but no provision was

made for compelling their attendance, and I am not aware that even to this day any such provision has been made.

These were the grievances and were provided for in our bill of rights. In misdemeanors merely, the rule was different in England, and we intended to abolish the distinction in all criminal prosecutions.

But it was never a question in England who should pay the expense of the witnesses; it was never complained that the government did not furnish the accused with the means of defence; the evil was that they were not allowed to have witnesses at all at their own expense, nor have them sworn.

The government of Great Britain did not formerly in general pay the expenses of the prosecution, at least of the witnesses; this was done by the prosecutor, although by several statutes the prosecutor and witnesses, by petition to the Judge, might obtain from the county their reasonable expenses, and if poor, an allowance for their loss of time. 1 Chitty's Crim. Law, 612. Later statutes have made further provision for their payment. Roscoe's Crim. Ev., 109.

The constitution in the section cited, secures to the accused the right to be heard in his defence by counsel. This also was designed to meet a practical evil; for until a recent period in Great Britain, parties accused of capital offences were not allowed counsel, except upon questions of law. This was a great defect. 3 Story's Com. on Cons. § 1787; 4 Black. Com. 356.

It is then manifest what were the great grievances which were intended to be guarded against by these American Declarations of Right.

They have fully met the emergency which called them forth, and no more was or is required. Why should they be extended to meet occasions which were never subjects of complaint?

The cases cited by the respondents' counsel are far from sustaining the position contended for.

*Universal practice,* I imagine, has settled this question.

Again, as to the objections to the verdict; if an assault

with intent to kill, be one offence, and an assault with intent to murder, be another and different offence, no reason is perceived why the verdict is not a perfectly good one for the former, and why it may not be found by the jury, although the indictment is for the latter. Nothing is better settled, than that the jury may find the accused guilty of part of the crime charged, and not guilty of the residue.

An assault with intent to murder, necessarily implies an intent *to kill;* and as one indicted for murder may be found guilty of so much of the offence as consists *in the killing,* and not of the residue, why may not one indicted for the assault with intent to murder, also be found guilty of the intent to kill?

This is expressly provided for in our statutes; c. 166, § 7, R. S. Nor is this finding a *misdemeanor* in an indictment for *felony,* but a felony of a lesser grade. *Commonwealth* v. *Griffin,* 21 Pick. 524; *Commonwealth* v. *Goodhue,* 2 Met. 193.

It is objected that two offences are charged in each of the counts, but in the argument the counsel admits that the terms used are synonymous in the statute. Such being the case the verdict is sustainable either as a *verdict for the whole offence charged,* or for a part of it and an acquittal for the residue.

If there be but one offence known to the statute, viz. the intent to murder, then notwithstanding the form of the verdict, it is really a verdict of guilty of the whole offence charged. The words "but not to murder," are unmeaning, and may be rejected. The jury find "a felonious assault *with intent to kill.*"

What makes homicide, murder? The malice aforethought. What is malice aforethought, but *the intention to do the deed?*

The counsel contend for this: — according to their position, the jury have found all the facts that in law constitute the offence charged; the intention to kill was to do that, which if done, is murder *by law.* The verdict may be re-

garded as in the nature of a special verdict, and the Court must pronounce what offence, upon such finding, has been committed.

Is it no offence by our law, to assault one with an intention to kill him, to take his life?

It is not contended that, at common law, there is any such offence as an assault with intent to commit *manslaughter*, to kill in the heat of blood; because *such intent* aggravates the crime to murder. But there is such an offence as assault with *intent to kill*, at common law, and the crime, if the intent be executed, would *not* be manslaughter.

In R. S., c. 154, § § 29, 30, between the words "kill" and "murder" is found a comma. Does this create two offences? It is quite immaterial in the case at bar how this question is answered. If two, the defendant has been convicted of the lesser, though indicted for the greater, as well he might be.

If one only, then he has been convicted of that one.

If the allegation in the indictment had been "kill or murder," there might be some plausibility in the objection.

The case in 8 Conn. 496, is direct authority, although grounded upon a statute of that State, to support this conviction.

If the verdict does not support the whole of the offence charged, it does of one known to the law, and may rightfully be returned on this indictment.

RICE, J. — The indictment charges, that John Waters, with two other persons named therein, " with force and arms, in and upon one Ivory Pray, with a dangerous weapon, to wit, the drawn sword of a sword cane, with which said John Waters, &c., were then and there armed, did make an assault, with an intention, him the said Ivory Pray, with the drawn sword aforesaid, then and there feloniously, wilfully, and of their malice aforethought to kill and murder."

As to the defendant, John Waters, the jury returned the following verdict, to wit, — "that the defendant, John

Waters, is guilty of a felonious assault, with intent to kill, but not to murder, Ivory Pray."

Before proceeding to trial, the respondents severally filed motions for issuing compulsory process for obtaining such witnesses in their favor as will be necessary for their proper defence, at the expense of the State.

The Court refused the motion, but ordered, that the respondents have compulsory process to bring in witnesses, who have been summoned and do not attend, at respondents' expense, and not at the expense of the State.

After verdict, the defendants severally moved, that judgment be arrested, because of the denial of the motion above referred to, as well as for other reasons set out in their several motions. These motions in arrest were overruled by the presiding Judge, and exceptions filed to said last rulings.

The right of compulsory process at the expense of the State, is claimed for the respondents under that clause of § 6, Art. I, of the Constitution, which provides, that in all criminal prosecutions, the accused shall have a right to have compulsory process for obtaining witnesses in his favor.

Section 22, c. 172, R. S., provides, that any person indicted for a crime, punishable with death, or by imprisonment in the State's prison for life, shall be entitled to have a list of the jurors returned, delivered to him or his counsel, a copy of the indictment, and process to summon his witnesses, at the expense of the State; all which it shall be the duty of the clerk to furnish without expense to the prisoner.

A fair construction of this section does not seem to give an accused person any right beyond that of having a list of jurors, a copy of the indictment, and the process for summoning witnesses at the expense of the State. That clause of the section making it the duty of the clerk to furnish these facilities to the prisoner without expense is in harmony with this construction. To furnish the list of jurors, the copy of the indictment, and the process for summoning

witnesses appropriately falls within the ordinary duties of the clerk. But to require that officer to furnish the funds necessary to pay the expenses of summoning, and the fees for the attendance of the defendant's witnesses, would seem to be requirements beyond the appropriate sphere of his official duties; nor is there any provision of law by which he could be reimbursed for such expenditures.

In capital trials, the practice has been, to tax and allow, as in ordinary criminal bills of cost in behalf of the State, the expenses for summoning and the fees for travel and attendance of the defendant's witnesses. The same practice has also prevailed in Massachusetts, from whence the rule was probably introduced into this State. In *Com.* v. *Williams*, 13 Mass. 501, the Court, in speaking of the practice say, that it was granted in capital trial only, in favor of life. The practice does not appear to have originated, either in Massachusetts or in this State, in any specific statute provision.

But were it otherwise, and did the statute already cited, extend the right of accused persons so far as to include the payment, by the State, of the expenses incurred by them in procuring the attendance of witnesses, it would not avail the defendants in this case, as the offence for which they are indicted does not fall within the provisions of that section.

But it is contended, that the constitutional provision, by its own force, gives this right to all persons accused of crime independent of statute provision.

Such is not the natural import of the language used in the constitution, and such cannot be its construction, unless there are circumstances connected with the insertion of the provision in that instrument, which will extend its meaning, by implication, beyond the ordinary signification of the words used.

In the early history of the common law, the means for defence allowed to persons accused of the higher grades of crime were much more limited than at present.

Thus, in capital trials the accused had no means of com-

pelling the attendance of witnesses, on his behalf, without a special order from the Court; and if witnesses attended, voluntarily, for such person, they could not be sworn. Except in the presentation of questions of law, he was not entitled to the aid of counsel in making his defence, nor was he entitled to a copy of the indictment against him.

Such unreasonable restrictions, in making defence against charges of an high and aggravated character, and where a conviction was followed with penalties involving both life and estate, early attracted the attention of the more enlightened jurists and statesmen of England, and were gradually made to yield to an advancing spirit of civilization, and more enlarged and correct views of personal liberty and individual right.

By c. 9, § 3, stat. 2, 1 Ann, provision was made that witnesses for the defendant, in case of treason or felony, shall be sworn in the same manner as witnesses for the crown; and by 7 William III., c. 3, § 7, that defendants in case of treason, shall have the same process to compel the attendance of witnesses for them, as was granted to compel witnesses to appear against them. The same statute provides that persons indicted for treason or misprison of treason, shall be entitled to have a true copy of the whole indictment, five days at least before trial, paying the reasonable fees for the writing thereof, not exceeding five shillings for the copy of every such indictment. The Court were also authorized to assign counsel for the accused.

Thus, though accused persons became entitled, by law, to a copy of the indictment against them, it was at their own expense, and though entitled to compulsory process for summoning witnesses, no provision was made for the payment of the expense, by the government. Indeed, at that time, the law provided no means for reimbursing or paying, the witnesses on the part of the prosecution. Such was the condition of the law until it was provided by 27th Geo. II., c. 3, § 3, " that when any poor person shall appear on recognizance, in any court, to give evidence against another,

accused of any grand or petit larceny, or other felony, it shall, and may be in the power of the Court, at the prayer and on the oath of such person, and in consideration of his circumstances, in open court, to order the treasurer of the county or place in which the offence shall have been committed, to pay unto such person, such sum of money, as to the said Court shall seem reasonable for his time, trouble and expense." The provisions of this Act for the payment of witnesses on the part of the government, were much extended by Geo. IV., c. 64.

It was in view of the history of the common law, that the founders of our governments, State and national, acted. They were fully aware of the practices by which the government of England had, in early times, crushed the individual rights of the subject, and of the long and severe struggle required to erect legal barriers against the encroachments of arbitrary power. It was the determination to preserve those barriers, and to mark distinctly the line between the legitimate powers of the government, and the personal rights of the citizen, that induced the founders of the American States to insert in their organic laws those solemn declarations of personal rights which are to be found in the Constitution of the United States, and of the individual States. Each assertion in the constitution, of a distinct personal right, was designed to repudiate some erroneous principle, or to guard against some particular wrong, which had been avowed or practiced by the government from which we had separated. The rights now claimed for the defendants, to have their witnesses paid by the government was never claimed in England or this country before the formation of our constitution. It was not one of the evils designed to be guarded against, nor a new right to be asserted by constitutional provision.

The question whether an accused person is entitled to compulsory process to bring in his witnesses before their fees have been paid, or tendered, has been discussed both in England and this country.

In *ex parte Chamberlain,* 4 Cow. 49, the Court decided, that in misdemeanors the defendant must tender his witnesses their fees as in civil cases, but in felonies witnesses were compellable to attend without fees. The question whether the defendant's witnesses were to be paid by the State was not raised in that case. The better opinion, in England, seems to be, that witnesses, (for the defence,) making default in criminal prosecutions are not exempt from attachment on the ground, that their expenses were not paid at the time of the service of the *subpœna.* 2 Russel on Cr. 947, *and note.*

The practice in this State, it is believed, has been different, and that compulsory process has been issued for defendants in criminal prosecutions in the same manner as in civil cases, and no good reason is perceived why there should be any distinction in the two classes of cases.

There was no error on the part of the Judge in denying the compulsory process as claimed by the defendants.

The verdict of the jury most distinctly answers the second cause assigned in the motion, when it says, " that the defendant, John Waters, is guilty of a felonious assault with intent to kill, but not to murder *Ivory Pray.*"

The third cause assigned is not sustained, certainly not to its full extent. That the verdict finds the defendant guilty of an assault, there can be no doubt. Nor can there be any doubt that it was competent for the jury to find the assault proved, and to negative the felonious intent. R. S., c. 166, § 7; *State* v. *Parmela,* 9 Cow. 259; *State* v. *Coy,* 2 Aik., 181; *State* v. *Burns,* 8 Ala. 313; *Bradley* v. *State,* 10, S. & M. 618.

The jury may acquit the defendant of part and find him guilty of the residue. 1 Chit. C. L. 637. Where the accusation includes an offence of an inferior degree, the jury may discharge the defendant of the higher crime, and convict him on the less atrocious. 2 Hale, 203. This rule applies in all cases where the minor offence is necessarily an elemental part of the greater, and when proof of the greater necessarily establishes the minor.

But a question of greater importance has been presented by the defence. The jury found that the defendant, John Waters, was guilty of an assault with intent to kill, but not to murder Ivory Pray. It is contended that this verdict is inconsistent and repugnant. If such be the fact it cannot stand. *Rex* v. *Woodfall,* 5 Burr. 2661.

That killing is a necessary element in murder, is apparent. Murder cannot be perpetrated without killing. But homicide is not, necessarily, murder; it may be a much less offence, and under some circumstances, not an offence.

But the question presented is, can an assault be made with intent to kill, which must not necessarily involve an intent to murder? Are not the terms in legal contemplation synonymous? By the counsel for the defendant, it is contended that they are. The statute, however, recognizes them as distinct offences. Section 29, c. 154, R. S. provides, that if any person being armed with a dangerous weapon, shall assault another, with intent to murder, kill, maim, rob, steal, or to commit arson or burglary, he shall be punished by imprisonment in the State prison, not more than twenty years." The same distinction is also made in the thirtieth section of the same chapter.

At common law there is no such crime recognized as an assault with intent to commit manslaughter, or simply to kill. Where an assault is made with intent to kill, the *intent* was supposed to imply malice, and therefore the offence was deemed to be an assault with intent to murder.

But in several of the States, as in this State, the statutes recognize an assault with intent to kill, and an assault with intent to murder, as distinct offences, the latter being of a higher grade and including the former. The existence of such a distinction has also been recognized by the Courts.

In *State* v. *Nichols,* 8 Conn. 496, the defendant was indicted for an assault with malice aforethought, with intent to kill and murder. The jury found the prisoner guilty *without malice aforethought,* of the crime whereof he stood

indicted. The Court held, that he was properly convicted of an assault with intent to kill, under the statute of 1830.

In *Scott* v. *Commonwealth*, 6 S. & R. 224, the plaintiff in error, had been indicted for an "assault with intent to kill and destroy." The jury returned a verdict of guilty of an assault with intent to kill. Duncan, J., in giving the opinion of the Court says, " the offence is assault and battery with intent to kill, an offence distinctly laid and punishable by law. * * * * If the party had been found guilty of killing, it would not rise higher than manslaughter."

In the case of *The Slave Nancy* v. *The State*, 6 Ala. 483, which was for an " assault with intent to kill and murder," the jury found a verdict of " guilty of an assault with intent to kill," and the Court refused to arrest the judgment on the ground, that it is a capital offence for a slave to assault a white person, with intent to kill, although if the intention had been consummated, the killing would have been manslaughter only.

In *State* v. *Burns*, 8 Ala. 313, the prisoner was indicted for an assault and battery with intent to kill and murder one David Walker. The jury found the defendant " guilty of an assault with intent to kill." The Court held, that the legal effect of this verdict was, (the defendant being a white man,) guilty of an assault and battery, only.

In *Bradley* v. *State of Miss.*, 10 S. & R. 618, the original defendant had been indicted for an assault upon Isham, a slave, " with intent wilfully, maliciously and feloniously, to commit manslaughter." The Court in considering this case, say, " this indictment can be construed only to be an indictment for an aggravated assault. It is not an indictment with intent to kill, by which is understood, and has been held, an intent to murder."

An examination of our statute will produce the conviction, that the Legislature did not have a very distinct conception of the nature of this offence. Thus, while the maximum punishment for manslaughter is imprisonment for a term of ten years in the State prison, the punishment for

an assault, with a dangerous weapon, with intent to kill, may be imprisonment twenty years in the same prison, thereby making the *attempt* to commit a crime much more highly penal than the commission of the substantive crime. The same apparent inconsistency may be found in the statutes of other States.

The intention of the Legislature probably was, to draw a distinction between that class of assaults which are the result of design and deliberation, and into which the element of legal malice is presumed to enter, and those assaults which are the result of sudden provocation, and where, in the heat of blood, the act so closely follows the intent, as to preclude the presumption of design, or deliberation, and consequently to exclude the presumption of malice.

If this be the true construction of the statute, and such apparently was the intention of the Legislature, it follows, as matter of necessity, that an assault with intent to *kill*, is a minor offence, but is included in the offence of "assault with intent to murder." The jury were therefore authorized to find the defendant guilty of a portion of the offence charged in the indictment, and not guilty of the residue. That finding was warranted, not only by the statutes, but by the authorities already cited in this case.

The exceptions and motion are overruled. —

*Judgment on the verdict.*

SHEPLEY, C. J., and CUTTING J. concurred. — HATHAWAY, J., concurred in the result only.